**Frank NAVARRO A/K/A Martin Javier Rodriguez, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–88–392–CR.**

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1989.

Discretionary Review Refused Dec. 6, 1989

Robert A. Rodriguez, Emmott & Arbuckle, P.C., Houston, for appellant.

John D. Holmes, Jr., Dist. Atty., Houston, for appellee.

Before UTTER, SEERDEN, and BENAVIDES, JJ.

## OPINION

UTTER, Justice.

A jury found appellant guilty of murder and assessed punishment at 10 years in the Texas Department of Corrections. We reverse and remand the cause to the trial court for the entry of an acquittal.

In his first point of error, appellant contends that the evidence is insufficient to show that he was a party to the murder committed by his co-defendant Pablo Macias.[1]

We will summarize the facts of the case in the light most favorable to the verdict. In the early morning hours of December 25, 1987, appellant and Macias were at a Houston bar. When the bar closed around 4:00 a.m., they exited with other patrons. Outside the bar, Macias and the deceased, Miguel Morales, began arguing. Morales stated that he did not want to fight that night but would come back the following day. During this argument, appellant went to a nearby truck, acquired a gun, and returned to stand next to Macias. Appellant handed the gun to Macias who, shortly thereafter, shot Morales in the neck, causing his death.

The trial court did not instruct the jury on the law of parties as set out in Tex.Penal Code Ann. § 7.02(b) (Vernon 1974), which provides:

> If, in the attempt to carry out a conspiracy to commit one felony, another

---

1. Specifically, he contends that the evidence fails to show that he promoted or assisted Macias with the intent to kill the victim, Miguel Morales. The State contends that it was not required to prove a specific intent to kill. Under the charge submitted to the jury *in this case,* the State is correct in saying that it was not required to prove a specific intent to kill. The real issue, however, is whether a person may be convicted as a party to the offense of murder without having "an intent to kill" when the party theory is restricted to Tex.Penal Code Ann. § 7.02(a)(2) (Vernon 1974). *Baldridge v. State,* 543 S.W.2d 639 (Tex.Crim.App.1976), held that knowledge of the accomplice's intent to kill was a necessary element to constitute a person as a principal to murder. Although *Baldridge* was decided under the former penal code, it was cited approvingly in *Randolph v. State,* 656 S.W.2d 475, 477 (Tex.Crim.App.1983). The State contends that *Baldridge* is no longer the

law, and relies on *Gutierrez v. State,* 681 S.W.2d 698, 704 (Tex.App.—Houston [14th Dist.] 1984, pet. ref'd). There, the Houston [14th] Court of Appeals expressed its thought that *Baldridge* was no longer valid under current law because Tex. Penal Code Ann. § 7.02(b) (Vernon 1974) authorizes a defendant's conviction for murder even if he had only intended to participate in an aggravated assault. In *Henry v. State,* 738 S.W.2d 332, 334 (Tex.App.—Houston [1st Dist.] 1987, pet. ref'd), the Court reached the same conclusion under section 7.02(a)(2). *See Binyon v. State,* 545 S.W.2d 448 (Tex.Crim.App.1976). *Flanagan v. State,* 675 S.W.2d 734 (Tex.Crim. App.1984), an attempted murder case, could be read to support appellant's position, however. Because we find the evidence insufficient to sustain the verdict under either theory set forth in the trial court's charge, we need not determine this issue.

felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

The trial court charged the jury only under Tex.Penal Code Ann. § 7.02(a)(2) (Vernon 1974), which provides:

(a) A person is criminally responsible for an offense committed by the conduct of another if ... (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense....

The trial court authorized the jury to convict under the theories of murder contained in Tex.Penal Code Ann. section 19.-02(a)(1) and (2) (Vernon 1989) in combination with section 7.02(a)(2). Thus, one paragraph of the charge allowed the jury to convict appellant if it found that "another person" intentionally or knowingly caused the victim's death and appellant "with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid" the other person in committing the offense. A second paragraph allowed the jury to convict appellant if it found that "another person" intended to cause serious bodily injury to the victim and caused the death by intentionally or knowingly committing an act clearly dangerous to human life, and that appellant "with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid" the other person in committing the offense.

In determining whether the evidence is sufficient to sustain a conviction, an appellate court reviews all the evidence in the light most favorable to the verdict to see if a rational trier of fact could find the elements of the offense beyond a reasonable doubt. *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Crim.App.1989).

■ Evidence is sufficient to support a conviction under the law of parties where the actor is physically present at the commission of the offense and encourages the commission of the offense either by words or other agreement. *Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Crim.App.1986); *Cordova v. State,* 698 S.W.2d 107, 111 (Tex. Crim.App.1985). The agreement, if any, must be before or contemporaneous with the criminal event. *Beier v. State,* 687 S.W.2d 2, 3 (Tex.Crim.App.1985).

The evidence must show that at the time of the offense the parties were acting together, each contributing some part towards the execution of their common purpose. *Burdine,* 719 S.W.2d at 315. In determining whether a defendant participated in an offense as a party, the court may examine the events occurring before, during, and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to commit the offense. *Burdine,* 719 S.W.2d at 315.

■ In *Ned v. State,* 654 S.W.2d 732, 735 (Tex.App.—Houston [14th Dist.] 1983, no pet.) the Court held that each party becomes liable for the escalated collateral crimes, even though these crimes may be unplanned and unintended, so long as they are the foreseeable, ordinary and probable consequences of the preparation or execution of the unlawful act itself. After considering *Mayfield v. State,* 716 S.W.2d 509, 514–516 (Tex.Crim.App.1986), we find that the Court's language in *Ned v. State, supra,* is overbroad in describing vicarious criminal liability under section 7.02(a)(2) which specifically requires the actor to have the intent to promote or assist the commission of the offense.

We now elaborate on the facts set forth above and determine if the evidence is sufficient to sustain the conviction. Although as many as a dozen persons were present when the shooting occurred, the only ones of those to testify at trial were Julisa Morales, Manuel Reyes, Joe Espinal, Pablo Macias, and appellant. We will summarize each witness' testimony, specifically focusing on the evidence which relates to appellant's intent.

Julisa Morales, Miguel Morales' sister, testified that she arrived at the El Ambiente Club at 1:00 a.m. with her brother and girlfriend. She danced with her brother's friends, Manuel Reyes and Jose Espinal. At some point during the night, Morales began arguing with a guy who wanted to dance with her. This argument had nothing to do with appellant or his co-defendant Macias. Julisa testified that neither had asked her to dance and that she had seen neither at the club. She had not seen her brother quarrel with either of the defendants inside the club.

Around 4:00 a.m., when they left the club, Morales got into an argument with Macias. Julisa testified that "they were saying about Mexicans." Macias was "talking about Mexicans. He was talking about people from El Salvador." Macias said that "Mexicans were tough." In response, Morales laughed. Macias then "started saying that people from El Salvador were trash and, you know, he started criticizing them." During this time, appellant "was just standing there" beside Macias. Julisa and her brother were from Honduras.

After this, Morales said that he didn't want to fight because he didn't have anything on him like a weapon and that if they wanted to fight to come the next day to the nightclub. Macias then said that he didn't want to wait until the next day, that he could take them all that night. At this point, Morales' girlfriend, Rosalba, said it was time to go home, and Morales then pushed Rosalba into a wall. Rosalba started crying and went to the street. Julisa followed her. Julisa heard no sounds that would indicate a fist fight. Julisa then heard one shot. Julisa testified that none of the people she was with had guns or other weapons and that she did not see anybody go get Macias a weapon. Julisa further testified that she did not see appellant aid or assist Macias. She did not hear appellant even speak.

Manuel Reyes testified that when he first exited the club, Macias and Morales were arguing. Macias was generally insulting Morales and all Hondurans. Reyes said he was about five feet away and could see everything that both Macias and appellant were doing. Reyes testified that neither he, the victim, or Jose had any weapons on them or in their cars.

Reyes further testified the two argued for about five minutes, and then appellant went to a truck. Before then, appellant barely said anything. Reyes testified that he did not hear Macias ask for a gun or ask appellant to do anything before appellant left. Reyes saw appellant go to the truck and then come back. Appellant stood about two feet behind Macias. Appellant then pulled a gun from his waist and gave it to Macias. When Macias got the gun, Reyes testified that Morales "simply remained there standing ... I do not believe he thought he was going to be shot at." Macias held the gun down at his side for about 30 seconds and continued making insults. Upon seeing the gun, Jose ran to hide behind a van and Reyes went to the side of a car. Some people ran inside the club.

Reyes further stated that during the entire time, he had not heard Macias say anything to appellant. Appellant was just laughing at what Macias was saying.

Jose Espinal testified that he did not know Morales but had danced two songs with his sister. Espinal testified that when he exited the club, Macias and Morales were arguing. Macias was insulting El Salvadorans. Appellant was standing by Macias' side "not saying anything."

Espinal testified that appellant left and then came back. Espinal did not hear Macias ask appellant for the gun. Appellant held out the gun and Macias grabbed it.

Pablo Macias, the co-defendant, testified that Morales exchanged fighting words with Macias' friend, El Nica, in the club's bathroom. When Macias and his friends were dancing, Morales or his friends would "go by and hit us with their elbows." When Macias and his friends left the club, the deceased and his friends were waiting for them.

Macias further testified that Morales started picking a fight with El Nica. Morales wanted to fight and Macias tried to

separate Morales from El Nica. Macias then agreed to meet Morales with a gun at 4:00 the next day. Two persons with Morales had handguns. El Nica went to his truck. Appellant left and came back. When El Nica returned he "had something on his waist." Macias told neither El Nica nor appellant to get a gun. Macias took a gun from appellant to scare the victim. Macias fired a shot straight up. El Nica fired his gun at the same time.

Appellant testified that insults were being yelled back and forth between El Nica and Macias and the other side. Both sides were insulting one another and appeared mad. Morales said that it was not possible to fight at the time, that he would wait for us the following day, and that we had no idea whom we were mingling with. Appellant testified that the argument was heated, but not to the point of a fight. As it went on, however, it was getting worse and appellant felt threatened.

El Nica left, and appellant followed him to his truck. El Nica pulled two guns from under his seat. El Nica gave appellant a gun. Appellant said nothing to El Nica, and El Nica said nothing to him. Both stuck the guns in their waists. Appellant returned to where Macias was. Insults were still being hurled back and forth. Appellant didn't hear anybody say anything to him. Macias then took the gun away from him and pointed it to the ground. Upon seeing the gun, Morales "just kept on laughing." Macias then fired his gun in the air.

No other eyewitnesses to the offense testified, and no other evidence was presented concerning appellant's mental state at the time of the commission of the offense.

The use of a deadly weapon in and of itself will not support proof of a specific intent to murder. *Brown v. State,* 657 S.W.2d 143, 145 (Tex.Crim.App.1983); *see also Herrell v. State,* 659 S.W.2d 825, 826 (Tex.Crim.App.1983). Likewise, appellant's handing of a deadly weapon to another does not in and of itself show that either appellant or the other person had an intent to commit murder. Appellant's intent to kill, or assist or promote Macias in commit-

ting murder, can only be inferred from this act if other circumstances warrant. *See Cordova v. State,* 698 S.W.2d 107, 111 (Tex.Crim.App.1985).

The State points out that appellant initiated the offense by acquiring the gun and introducing it into the argument, that appellant heard Macias say he could "take them all on" that night, and that appellant knew Morales was unarmed.

We acknowledge that, but for appellant's obtaining the gun and handing it to Macias, the murder would not have occurred, but we find that the other circumstances fail to show that appellant's acts were committed with the intent to kill or to assist or promote another in committing murder.

Although the jury could have found that appellant gave a gun to a person who was threatening an unarmed person who did not want to fight, there is no evidence that Macias orally threatened anyone with death or serious bodily injury. The most that can be said is that Macias was criticizing nationalities and was willing to "take on" everyone that night. Macias' insults and name calling did not threaten anyone with death or serious bodily injury.

While there is some evidence that El Nica exchanged "fighting words" with someone from Morales' group while they were inside the club's bathroom, there is no evidence to show that appellant was aware of these "fighting words" or that these "fighting words" rose to the level of threats to kill or cause bodily injury.

The evidence does not show any relationship between the defendants and Morales prior to the night of the killing from which the jury could have inferred that appellant possessed an intent to kill or cause serious bodily injury to Morales.

There is no evidence that Macias, El Nica, or anyone else directed appellant to retrieve the gun for the purpose of killing or inflicting serious bodily injury. In fact, the evidence indicates that no communications were made between appellant and Macias.

In summary, no circumstances prior to the shooting indicated that appellant in-

tended to kill or cause serious bodily injury to Morales. The evidence is insufficient to sustain the conviction. *See Baldridge,* 543 S.W.2d at 639; *Morales v. State,* 466 S.W.2d 293, 302–304 (Tex.Crim.App.1971).

Appellant's first point of error is sustained. Therefore, we need not address appellant's remaining points of error.

The judgment of the trial court is REVERSED and the cause is REMANDED to the trial court for entry of an acquittal.